998 So.2d 107 (2008)
RADCLIFFE 10, L.L.C.
v.
ZIP TUBE SYSTEMS OF LOUISIANA, INC., Burger Engineering, L.L.C., Ronald Burger and Bryan Burger.
Burger Engineering, L.L.C.
v.
Radcliffe 10, L.L.C. and James M. Radcliffe.
Nos. 2007 CA 1801, 2007 CA 1802.
Court of Appeal of Louisiana, First Circuit.
August 29, 2008.
Rehearing Denied in Part, Granted in Part December 3, 2008.
*109 Joseph L. McReynolds, Kerrie T. Belsome, Isaac H. Ryan, New Orleans, LA, for Defendants/Appellants, Zip Tube System *110 Of Louisiana, Burger Engineering, L.L.C.
Chadwick W. Collings, Tom H. Thornhill, Slidell, LA, for Defendants/Appellants, Ronald G. Burger and Bryan Burger.
Craig J. Robichaux, Mandeville, LA, Mark S. Goldstein, New Orleans, LA, for Plaintiffs/Appellees, Radcliffe, 10, L.L.C. and James M. Radcliffe.
Before GAIDRY, McDONALD and McCLENDON, JJ.
McDONALD, J.
This appeal arises from the sale of Zip Tube Systems of Louisiana, Inc., a pneumatic tube business owned by Ron and Linda Burger, to Radcliffe 10, L.L.C., a Louisiana limited liability company formed and owned by James Radcliffe specifically to purchase Zip Tube's assets and business operations. Following a bench trial of consolidated law suits filed by both the buyer and the seller, the trial court rendered judgment against the Burgers and in favor of Radcliffe. The Burgers have appealed.

FACTS AND PROCEDURAL BACKGROUND
Ron Burger worked in the pneumatic tube business for many years prior to May 1981, when he started a Louisiana business as a distributor for Zip Tube Systems in Denver, Colorado. The business, Zip Tube Systems of Louisiana, (Zip Tube) originally was formed in order to become a licensed distributor for the Denver company, to obtain better product prices for job bids in the pneumatic tube business. In the mid-1990's, Ron's son, Bryan, who had been involved in the business part-time during college, graduated with a degree in electrical engineering and began working full-time at Zip Tube in sales and management. By 2001, Zip Tube was installing, manufacturing and servicing pneumatic tube systems. Ron Burger, then in his early 60s, decided to retire and listed the business for sale with C.B. Walker of Sunbelt Realty.
In 2001, James Radcliffe was working as a national director of sales for Cypress Bioscience and had moved to Louisiana. After September 11, 2001, the company closed down and Mr. Radcliff, who had considered investing in his own business upon moving back to Louisiana, decided to look for a business to buy. He contacted Sunbelt Realty because of its expertise in business brokerage and was referred to Mr. Walker. After reviewing a number of other potential investments, Mr. Radcliffe began negotiating with Mr. Burger, through Mr. Walker, for the purchase of Zip Tube.
Mr. Radcliffe applied for a loan to be issued by Comerica Bank and guaranteed in large part by the Small Business Administration in order to buy Zip Tube. At that point, the terms of the purchase called for a cash payment of $685,000.00 with the balance to be paid through a promissory note. Comerica objected to the note and the SBA had concerns about Mr. Radcliffe's lack of experience in the pneumatic tube business. According to Ron Burger, to alleviate both concerns and to enable Radcliffe to obtain the SBA guaranteed loan, the parties agreed to enter into a consulting agreement, under which Ron Burger would provide Radcliffe with consulting advice for a maximum of eight hours per month for a period of five years, for the $850,000.00 balance of the purchase price. This amount was payable in equal monthly installments of $14,667.67 for a period of sixty months commencing on September 3, 2003.
On August 30, 2002, the parties entered into a cash sale of business assets, in which Zip Tube of Louisiana, Inc. sold to Radcliffe 10, L.L.C. certain assets of its business *111 for the sum of $685,000.00, of which $225,000.00 represented the purchase price for the immovable property on which the business was located and $460,000.00 was for other assets identified in the Asset Purchase Agreement. The Asset Purchase Agreement was a 21-page document prepared by the Burgers' attorney. The document contained warranties and covenants of the seller and buyer, provisions regarding indemnification and insurance, and exhibit attachments listing accounts receivable, accounts payable, included assets, contracts, and excluded assets. The document also provided, among "Conditions Precedent to the Obligations of Seller," that the "Purchaser shall execute the Consulting and Non-Compete Agreement, which has been agreed to by the parties." An Act of Cash Sale of Property was also executed on Friday, August 30, 2002, to effect the sale of the immovable property on which Zip Tube's business was located. On the next business day, September 3, 2002, Radcliffe 10, L.L.C. and Zip Tube Systems of Louisiana, Inc. entered into a Consulting and Non-Compete Agreement with Burger Engineering, L.L.C, authorized by and "between certain individuals enjoining herein, namely, James M. Radcliffe, Lynda Burger, Ronald Burger, and Bryan Burger." This document also was prepared by the Burgers' attorney. Mr. Radcliffe was not represented by an attorney, and admittedly had not obtained legal counsel prior to entering into the agreements.
The consulting agreement alone did not provide Mr. Radcliffe, who had no prior experience in the pneumatic tube business, with sufficient assistance in running the business because it only provided for only a maximum of 8 hours a month in consulting services. In September 2002, employment agreements were entered into between Radcliffe and Bryan Burger, employing him at a salary of around $78,000.00 per year plus insurance benefits. Ron Burger also was employed at a starting salary of $1,000.00 per month plus insurance benefits. The relationship between Radcliffe and the Burgers soon deteriorated. In June 2003, Ron Burger was fired and in August 2003, Bryan was also fired.
On August 29, 2003 Radcliffe filed suit against Zip Tube, Burger Engineering, and Ron and Bryan Burger. The petition alleged in part that Ron Burger or Burger Engineering had impaired intellectual property or business opportunities purchased by Radcliffe, and made misrepresentations or untruths that damaged Radcliffe's business reputation; and that Bryan Burger had converted property belonging to Radcliffe, disrupted Radcliffe's business by resetting security codes on the building alarms and erasing forwarding telephone numbers, disabled or deleted company engineering files, and appropriated corporate opportunities. The petition further alleged that the acts of the Burgers, individually or jointly, constituted unfair trade practices in violation of La. R.S. 51:1401 and demanded damages for past, present and future loss of business, income, profits and other consequential damages. The defendants denied Radcliffe's claims. In October 2003, Burger Engineering, LLC filed a petition seeking enforcement of the consulting agreement, but later sought to rescind the sale based on fraud by Radcliffe in representing his assets and working capital.
On October 17, 2003, Radcliffe filed a petition for injunctive relief, and subsequently obtained a temporary restraining order prohibiting the defendants from intercepting mail or other deliveries, controlling phone numbers or post office boxes, and impacting web services or other advertising media.
*112 The suits filed by Radcliffe and by Burger were consolidated for trial. In his pre-trial brief, Radcliffe listed Michael Burris as an expert witness on business sales and accounting practices. Prior to the scheduled bench trial, the trial judge advised counsel for both parties that Mr. Burris had served as his campaign treasurer and was his certified public accountant. The judge did not believe that the relationship would impair his impartiality or was significant enough to require his recusal from the matter. One of the counsel for the Burgers had also served on the committee to elect the judge, and the defendants did not claim that the judge's relationship with Mr. Burris was cause for recusal.
The matter was tried on February 10, 11, and April 4, 5, and 6, 2005. At the conclusion of testimony, the record was left open and additional time allowed for the taking and submission of a witness deposition and for post-trial memoranda. After taking the matter under advisement, the trial court issued thirteen pages of written reasons on June 24, 2005, finding in favor of Radcliffe 10 and Radcliffe. On July 29, 2005, prior to the signing of a judgment, the defendants filed a motion to recuse the trial judge, claiming that they had discovered that the relationship between the judge and Mr. Burris, Radcliffe's expert, was significantly closer than the judge had disclosed.
A hearing on the recusal motion was scheduled for August 25, 2005. The judge assigned to hear the matter ruled that the motion, filed after the conclusion of the trial on the merit s, was untimely. Writs were filed with this court, which were denied. The supreme court granted writs, and remanded the matter to the trial court for a hearing on the recusal motion.
A full hearing was conducted, at which the hearing judge received testimony and reviewed the various transactions and relationships between the trial judge and Radcliffe's expert. The court denied the recusal motion, finding that the evidence did not establish any basis for recusal under La. C.C.P. art. 151 and particularly under article 151 B(5)[1], the basis for the defendants' motion. The judge further found Canon 3 C of the Code of Judicial Conduct[2] did not provide a separate ground for recusal, regardless of the movers' assertion that the judge's impartiality could be reasonably questioned.
Thereafter, a judgment on the merits of the trial was signed by the trial judge on March 29, 2007. The judgment found in favor of Radcliffe 10, L.L.C. and against Zip Tube Systems of Louisiana, Inc., Burger Engineering, L.L.C, Ronald Burger and Bryan Burger, in solido, declaring:
a. The Act of Cash Sale of Property dated August 30, 2002, recorded as Instrument # 1322468 is a complete transaction and translative of ownership of the immovable property to Radcliffe 10, L.L.C;

*113 b. The property conveyed by the Act of Cash Sale of Property dated August 30, 2002, recorded as Instrument # 1322468 is encumbered by a mortgage in favor of Comerica Instrument # 1322471, but the defendants do not have a security interest, vendor's lien, or privilege in the property. To the extent that the UCC-1 (recorded at Instrument #52027870) filed by the defendants purports to create a security interest, it is hereby declared to be invalid;
c. The Act of Cash Sale of Business Assets dated August 30, 2002, is a complete transaction and translative of ownership of all of the business assets of the business formerly conducted by Zip Tube Systems of Louisiana, Inc. to Radcliffe 10, L.L.C., except only those assets listed in Exhibit 1.9 to the Asset Purchase Agreement
Included within the assets which were transferred to Radcliff 10, L.L.C, but not by way of limitation, were the fax number(s), phone number(s), mailbox, website (both ziptube.com and tubesystem.com), logo, and other identifying features of the company, including the name(s) Zip Tube, Zip Tubes, Zip Tube Systems, and Zip Tube Systems of Louisiana, Inc.
d. The property conveyed by the Act of Cash Sale of Business Assets dated August 30, 2002, is encumbered by Security interest in favor of Comerica (as specifically described in the UCC-1 recorded at Instrument # 52-26971), but the defendants do not have a security interest, vendors lien or privilege in the property. To the extent that the UCC-1 (recorded at Instrument # 52-27870) filed by the defendants purports to create a security interest, it is hereby declared to be invalid;
e. The Consulting and Non-Compete Agreement dated September 3, 2002, does not create any security interest whatsoever in any of the assets of the sales referenced herein;
f. The Consulting and Non-Compete Agreement dated September 3, 2002, as drafted, is "contra bonos more." The non-compete restricting the activities of Radcliffe 10, L.L.C. and/or James M. Radcliffe violates LSA-R.S. 23:931. The offending clause(s) are severed in accordance with the terms of the contract;
The judgment further ordered that ownership in certain listed vehicles and a motor home was vested in Radcliffe 10, L.L.C; that the Siemens's settlement, which in part granted an exclusive right to conduct business with Zip Tube Systems of Louisiana, Inc., was a bilateral contract between Siemens Corporation/Siemens' Building Technologies, Inc., and Zip Tube Systems of Louisiana, Inc., and was an asset included in the sale, and the rights under the contract are assets of Radcliffe 10, L.L.C; that damages in the amount of $3,428,000.00 plus attorneys fees and costs were awarded in favor of Radcliffe 10, L.L.C. and against the named defendants; that the damages ordered bear legal interest from the date of judicial demand until paid; that the prior temporary restraining orders were converted to permanent injunctions, and the prohibited activities were listed; and that the defendants were granted the right to a hearing on the issue of the amounts of attorney fees and costs.
The defendants timely filed a suspensive appeal but could not obtain a bond, assignments of error: so the matter is before us as a devolutive appeal with the following
1. Judge Knight breached his duty under Canon 3 C of the Code of Judicial Conduct either to recuse himself, because his impartiality could reasonably be questioned, or to make a full disclosure to the defendants and their attorneys *114 of his relationship to Michael Burns, close personal and professional relationship to Michael Burris, plaintiffs sole expert on damages.
2. Judge Garcia erred in denying defendants' recusal motion because the evidence, establishing Judge Knight's relationship to Michael Burris, was sufficient to prove bias in favor of Burris' credibility, under La. Civil Code Article 151 B(5), and sufficient to raise reasonable questions as to Judge Knight's impartiality under Canon 3 C of the Code of Judicial Conduct that obligated Judge Knight either to recuse himself from deciding the case or to make a full disclosure to the parties, which he did not do.
3. Judge Knight erred as a matter of law in concluding that the purchase price of defendants' pneumatic tube business was only $685,000, rather than the negotiated price of $1,535,000.00, and in enforcing the sale without ordering plaintiff to pay the balance owed under the sales contracts.
4. Judge Knight erred as a matter of law that defendants transferred the name of "Zip Tube Systems of Louisiana, Inc.," the name of Ron Burger's corporation, when the sales documents transferred only the assets of the corporation, not its stock certificates.
5. Judge Knight erred as a matter of law and fact in concluding that defendants breached the Consulting and Non-Compete Agreement.
6. Judge Knight erred in accepting the methodology of Michael Burris in fixing damages in the amount of $2,362,000.00 plus lost profits in the amount of $1,066,000.00, based on plaintiffs projected revenues before the sale was confected, when the record fails to disclose what contracts plaintiff was not able to procure due to competition from defendants.
7. Judge Knight erred as a matter of law and fact in concluding there was no fraud in the inception of the contract, based on plaintiffs misrepresentations to the lenders who financed his SBA loan and to the Burgers, as to his financial ability to provide required equity necessary to continue the business as a going concern.

LAW AND ANALYSIS

RECUSAL
The first two assignments deal with the failure of the trial judge to recuse himself from this case because of his relationship with Michael Burris, the expert for Radcliffe, and the failure of the judge hearing the recusal motion to grant it. After hearing the motion, the judge issued detailed reasons for denying the motion to recuse the trial judge. He noted that he conducted an extensive hearing and an in camera inspection of twelve volumes of material. He concluded that "[t]his record echoes with the absence of evidentiary proof that Judge Knight was biased, prejudiced or interested in the cause or its outcome or that he was biased or prejudiced toward or against any parties or their attorneys." He further noted the five instances in which the judge had associated with the witness, stating "[t]his evidence was presented but no proof was made that the existence of these facts would lead to the conclusion that Judge Knight was biased or prejudiced or unable to conduct a fair or impartial proceeding." Obviously, the facts did not lead the hearing judge to conclude that Judge Knight was unable to conduct a fair hearing. These are factual findings and are subject to the "manifest error" or "clearly wrong" standard of review.
*115 Much of appellants' argument is focused on the reasons that Judge Knight should have been recused. An extensive hearing was conducted, and no facts were found to warrant the recusal of Judge Knight. The issue is not what we, as a reviewing court, believe the facts may or may not show as to the need for recusal, but it is whether the judge's finding that the facts did not warrant Judge Knight's recusal was manifestly erroneous. We cannot say that it was. The findings and conclusions that Judge Knight's relationship with the witness did not warrant recusal are thorough and sound.
In addition to the factual findings that there was no reason to recuse Judge Knight under La. C.C.P. art. 151(B), a legal decision was made that the Code of Judicial Conduct Canon 3 C does not provide an independent basis for recusal of a judge. This decision is subject to a de novo review. However, we agree that La. C.C.P. Art. 151 creates an exclusive list of grounds for mandatory recusal of a judge. The supreme court has advised that the recusation of judges is a serious and important legal procedure. In each possible recusal situation, there is a countervailing consideration that militates in favor of a judge's not recusing himself, or being recused; that is, that the judge has an obligation, part of his sworn duty as a judge, to hear and decide cases properly brought before him. He is not at liberty, nor does he have the right, to take himself out of a case and burden another judge with his responsibility without good and legal cause. In re Lemoine, 96-2116 (La.1/14/97), 686 So.2d 837, 839-40. There is no legal cause to recuse the trial judge in this matter.
The appellants' strenuously argued position is premised on the appearance of impropriety and a concomitant lack of public confidence in the fairness and integrity of the judiciary, issues discussed by the supreme court in Lemoine. The Code of Judicial Conduct, however, does not require recusation of a judge to avoid the appearance of impropriety, but states that a judge should recuse himself if his "impartiality might reasonably be questioned." Appellants concede that this is voluntary, not mandatory. Clearly, Judge Knight had the right to recuse himself if he believed it was warranted or necessary. Our decision, however, must be based on whether there was clear evidence, direct or circumstantial, that he was biased, prejudiced, or interested in the cause or its outcome. After thorough review of the entire record in this matter, we find nothing to suggest the appellants' cause was not given a fair and impartial hearing and no grounds to reverse the decision to deny the motion to recuse.

TRIAL ISSUES

The Sales Price
The third assignment of error alleges that the trial court committed legal error in finding that the sales price for the assets of Zip Tube was $685,000.00. The trial court found that the documents actually comprising the act of sale between Radcliffe 10 and Zip Tube were the two documents signed August 30, 2002, i.e., the cash sale of immovable property and the cash sale of business assets. The court concluded that the recited sales price of $685,000.00 ($225,000.00 for the immovable property and $460,000.00 for the other assets of the business) was controlling, noting that any ambiguity in the documents would be construed against the drafter, Burger.
A sale is a contract whereby a person transfers ownership of a thing to another for a price in money. The thing, the price, and the consent of the parties *116 are requirements for the perfection of a sale. La. C.C. art. 2439. Ownership is transferred between the parties as soon as there is agreement on the thing and the price is fixed, even though the thing sold is not yet delivered nor the price paid. La. C.C. art. 2456. Interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046.
We have before us a contract of sale subject to the above-stated law. We observe, though it is not an issue, that the object of the sale was a thing susceptible of sale and that the parties had the requisite capacity to contract. We agree with the trial court that the document purporting to be the cash sale of business assets did state a sales price of $685,000.00. The document also states that "[t]he parties hereto incorporate by reference the Asset Purchase Agreement." It further provides that "[a]ll of the terms and conditions, warranties, representations and covenants set forth in the Asset Purchase Agreement remain in full force and effect and are incorporated herein by reference." Therefore, in order to determine the intent of the parties to this sale, it is necessary to consider the Asset Purchase Agreement as it is part of the sale of the business assets. The Asset Purchase Agreement provides that as a condition precedent to the obligations of the seller, the purchaser "shall execute the Consulting and Non-Compete Agreement, which has been agreed to by the parties."
The legal issue before us is whether in August 2002, Mr. Radcliffe intended to buy the assets offered for sale by Mr. Burger for $685,000.00 as evidenced by the Act of Cash Sale of Business Assets alone. We recognize that at the point the trial court was interpreting the documents, it was apparent that the assets transferred were not of the value claimed, nor in many cases, were the assets transferred. However, it is not the province of the courts to relieve a party of a bad bargain, no matter how harsh. Sunrise Const. and Development Corp. v. Coast Waterworks, Inc., 00-0303 (La.App. 1st Cir.6/22/01), 806 So.2d 1, 5, writ denied, 01-2577 (La.1/11/02), 807 So.2d 235. We find that in order to determine the intent of the parties at the time the sale was perfected, all three documents should be considered.
Having reviewed the three documents in question, we find that the parties agreed to a sales price of $1,535,000.00, which is the sale price on the sale of business asset agreement, $685,000.00, plus the $850,000.00 value of the consulting agreement. This is corroborated by testimony of Mr. Radcliffe that it was his understanding that the purchase price was around $1,500,000.00. We agree with appellants that it was error for the trial judge to find that the purchase price was $685,000.00.

The Trade Name
The fourth assignment of error involves whether the name "Zip Tube Systems of Louisiana" was transferred in the sale of assets. The defendants argue that there was no transfer of stock in the corporation and Ron Burger retained the corporation and the corporate name. The trial court found that the sale transferred the name as well as the listed assets. Reviewing the Asset Purchase Agreement, we find that § 1.11 "Intangible Property" is defined to include "all intangible property owned by Seller and necessary or useful in the operation of the Business, including without limitation, all licenses, permits, designs, schematics, franchises, accreditations and registrations, goodwill, names, *117 trade names, and trademarks." Additionally, Exhibit 1.3 of the agreement is the list of included assets and includes "trade goodwill, trademarks, trade names, proprietary information and other intangible assets." We do not believe that the judge's determination that the name Zip Tube Systems of Louisiana was sold as an asset of the business Mr. Radcliffe purchased required any testimony, expert or otherwise. We find no error in the trial court's decision. Whether the sale of the business also included the stock of the corporation of Zip Tube Systems of Louisiana, Inc., was not addressed by the trial court.

Breach of Non-Compete Agreement
The appellants' next raise as error the trial court's finding that the Burgers breached the consulting and non-compete agreement. Appellants assert that any acts by the Burgers that could be construed as breaching the consulting and non compete agreement took place after September 2003, when it was legally permissible for the Burgers to compete with Radcliffe. Appellants examined several of these acts, arguing for the conclusion that they did not constitute an unfair trade practice. Initially in considering this assignment of error, we observe that a finding that the Burgers did not breach the consulting and non-compete agreement is not dispositive of the issue of whether their actions constituted an unfair trade practice. While the Burgers' acts may not have been in breach of the agreement, they may have been an unfair trade practice.
The appellants assert that the Burgers' obligations under the consulting and non-compete agreement were not to compete within the territorial limits provided in the agreement, nor solicit any employees of Radcliffe during the life of the contract. They maintain that there is no evidence whatsoever in the record that Ron or Bryan Burger competed or solicited any work or employee within these limits before Radcliffe filed suit, and any actions taken after that time were legally permissible under La. C.C. art. 2022. Louisiana Civil Code article 2022 provides: "Either party to a commutative contract may refuse to perform his obligation if the other has failed to perform or does not offer to perform his own at the same time, if the performances are due simultaneously."
We agree with appellants that the Burgers did not breach the consulting and non-compete agreement. In addition to this finding being reached by an examination of the law, the record reveals that the issue of when work was solicited or performed by the Burgers was investigated by Radcliffe through discovery and no violations were discovered. However, we do not agree with the conclusion that the Burgers were not guilty of unfair trade practices.
The trial court's finding that named acts by the Burgers evidenced unfair trade practices was not specifically assigned as an error by the appellants. However, their brief contends that case law holds that the question of whether an employee owes any fiduciary duty collapses into a question of whether an employee's actions constitute an unfair trade practice. We do not find the issue of an employee's fiduciary duty or of breach of the non-compete agreement to be synonymous with the issue of unfair trade practice in this case. Generally, employees have no fiduciary duty to their employers. Also, a large number of cases dealing with allegations by an employer of violations of the Louisiana Unfair Trade Practice Act by a former employee are not relevant here because our context is significantly different than an ordinary employer-employee relationship. Because *118 the unfair trade practice finding was not challenged by appellants, we will not analyze this further. Suffice it to say, we find no error in the trial court's decision that the Burgers engaged in unfair trade practices.

Damages
Appellants claim that Mr. Burris' methodology for assessing damages is completely wrong and devoid of any evidentiary support. They contend that the damage assessment was incorrectly based on the difference between Radcliffe's projected gross sales and his actual sales, based on the business plan that Radcliffe prepared in March 2002, but that the proper measure of damages is net income, or lost profit, not gross income. The trial court's reasons for judgment specifically stated that it accepted Mr. Burris's methodology.
Mr. Burris is a licensed certified public accountant qualified as an expert in the field of certified public accounting. In conjunction with his testimony, Mr. Burris reviewed the transaction documents in connection with the sale, and financial records including tax returns and general ledgers both prior and subsequent to the sale. In connection with the sale, he reviewed documents important to the Comerica financing, including risk rating procedures, credit approval or denial records and lenders credit memorandum, collateral modifications, various financial analyses and the business valuation of Zip Tube Systems of Louisiana, Inc. Mr. Burris testified that Comerica valued the fair market value range for 100% of the operating assets, including the real estate, of Zip Tube as of May 31, 2002 as $875,000.00 to $925,000.00. It was his opinion that the major value of the business was its income stream as a "going concern," which never in fact materialized, and that significant other assets were not delivered. After extensive testimony regarding features of the sale transaction as well as business operations, Mr. Burris was asked to explain how the factors that had been discussed, including overstated assets, declining sales, and interference with the business (by the Burgers), had damaged Mr. Radcliffe's business. Mr. Burris testified that he utilized the same approach as the Comerica valuator did, using the same "EB multiple" to determine that Mr. Radcliffe should own a business worth $2,362,000.00 that would have generated $1,066,000.00 in profits up to the time of trial. Mr. Burris further testified that considering some of the property was either not delivered or overvalued, in his opinion the approximate damage was $4,000,000.00.
We do not agree with the appellants' characterization of the methodology of Mr. Burris's testimony or that there is no evidentiary basis for it. It was Mr. Burris's opinion that Mr. Radcliffe did not get what he bargained for and that the business failed for a variety of reasons. Mr. Burris did not believe that Mr. Radcliffe's management of the business was deficient, but that he had "done an outstanding job based on what he had to work with."
Harold Asher, the expert in business valuation hired by the Burgers, testified that Mr. Radcliffe's damages were based on one factor, Mr. Radcliffe. It was Mr. Asher's opinion that the reason the business failed was because it was undercapitalized and that Mr. Radcliffe "looted" the company by paying himself a salary in excess of what was projected in the business plan. According to Mr. Asher's calculations, Zip Tube was insolvent by September, 2003. It was his opinion, therefore, that any actions taken by the Burgers (presumably all after September 2003) had no effect on the business. Mr. *119 Asher's opinion was formulated in 2005; in 2003, Mr. Radcliffe was working and investing personal funds in an attempt to keep his business viable.
We cannot agree that the loss of his business telephone and the other acts taken by the Burgers to sabotage his business had no effect. We also note that Zip Tube's corporate tax return for the year 2000 shows "compensation of officers" of $743,797.00. The officer compensated was Ron Burger; for the tax year 2001, officer compensation paid to Ron Burger was $199,100.00. It is hard to accept a characterization of Mr. Radcliffe's salary, which was considerably less than either of these figures, as "looting."
Appellate courts have a constitutional duty to review facts and have every right to determine whether the trial court finding was clearly wrong based on the evidence or clearly without evidentiary support. The reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's findings were clearly wrong or manifestly erroneous. Siverd v. Permanent General Ins. Co., 05-0973 (La.2/22/06), 922 So.2d 497, 499. However, the task of the reviewing court is not to assess whether the trial court's factual findings are right or wrong in an absolute sense, nor to determine whether the court of appeal or another trier of fact might reasonably reach a different conclusion from the same evidence, but solely to ask whether this fact finder's resolution of the conflicting evidence was reasonable in light of the record as a whole. Holford v. Allstate Ins. Co., 41,187 (La.App. 2nd Cir.6/38/06), 935 So.2d 758, 762. The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Hanks v. Entergy Corp., 06-477 (La.12/18/06), 944 So.2d 564, 580-81. We find the record contains a reasonable basis for the trial court's decision, that Mr. Burris's testimony was not patently unsound, and no error in the trial court's assessment of the damages in this matter.

Fraud
The appellants' final assignment of error asserts that the trial court erred in concluding that there was no fraud in the inception of the contract based on Mr. Radcliffe's misrepresentation of his financial ability to provide equity required by the lender and necessary to continue the business as a going concern. This finding is subject to a manifest error standard of review. Fraud involves a misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. La. C.C.art.1953, Cortes v. Lynch, 02-1498 (La.App. 1st Cir.5/9/03), 846 So.2d 945, 950. Fraudulent intent, which constitutes the intent to deceive, is a necessary element of fraud. Whitehead v. American Coachworks, Inc., 02-0027 (La.App. 1st Cir.12/20/02), 837 So.2d 678, 682. We find no error in the trial court's finding that there was no fraud on Mr. Radcliffe's part in the inception of the contract.

CONCLUSION
We are mindful that appeal courts are required to give great deference to the factual findings and mixed questions of law and fact of a trial court. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. *120 However, in reviewing this record, we did not find this stricture constraining. The matter was initiated in September 2003, and several hearings demonstrative of the facts were before the trial court prior to the five-day trial in the spring of 2005. The record reveals that the trial court had an excellent understanding of the issues, was extremely attentive to all testimony, and painstaking in its review of the voluminous evidence.
The judgment rendered adjudicated numerous issues not before us on appeal and as to those issues not appealed, the judgment is final as a matter of law. After careful consideration of the matters raised in this appeal, we amend the judgment to order Radcliffe 10, L.L.C. to pay to Burger Engineering, L.L.C. the sum of eight hundred and fifty thousand dollars ($850,000.00) plus judicial interest from the date of demand until paid, and delete section "e" of the first order of the judgment, declaring that the Act of Cash Sale of Business Assets is a complete transaction translative of ownership. In all other respects, the judgment is affirmed. Costs of this appeal are assessed against the defendants.
AFFIRMED IN PART; AMENDED IN PART AND RENDERED.
NOTES
[1] Louisiana Code of Civil Procedure Article 151 provides the grounds for recusal of a judge of any court. Article 151 B provides that a judge may be recused under various specific circumstances, including when he "[i]s biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties' attorneys to such an extent that he would be unable to conduct fair and impartial proceedings."
[2] Canon 3 C provides "Recusation. A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned and shall disqualify himself or herself in a proceeding in which disqualification is required by law or applicable Supreme Court rule. In all other instances, a judge should not recuse himself or herself."